**Charles LEEDS and Patricia Leeds, his wife, Appellants,**

*v.*

**CINCINNATI, INC., Appellee.**

**No. 83–5395.**

United States Court of Appeals, Third Circuit.

Argued Jan. 27, 1984.

Decided April 26, 1984.

---

Nancy H. Fullam (argued), Daniel L. Thistle, Beasley, Hewson, Casey, Colleran, Erbstein & Thistle, Philadelphia, Pa., for appellants.

Burchard v. Martin (argued), Martin, Crawshaw & Mayfield, Westmont, N.J., for appellee.

Before GIBBONS and BECKER, Circuit Judges, and DUMBAULD, District Judge.[*]

## OPINION OF THE COURT

BECKER, Circuit Judge.

This is a products liability case arising under New Jersey law, brought before the district court under its diversity jurisdiction, 28 U.S.C. § 1332 (1976). Plaintiff Charles Leeds, an employee of Harris Steel Corporation, had his right thumb and index finger amputated in 1978 while he was inserting certain pieces of cardboard between strips of moving steel at the "pinch point" of a recoiler on a "coil slitting line" manufactured by the defendant Cincinnati, Inc. and sold to Harris in 1969. Charles Leeds and his wife Patricia brought suit against Cincinnati for the attendant damages, alleging that Cincinnati had defectively designed the machinery bought by his employer. In response to questions propounded by the district court pursuant

[*] Honorable Edward Dumbauld, United States District Judge for the Western District of Pennsylvania, sitting by designation.

to Fed.R.Civ.P. 49(a), the jury found as a fact that the defendant had not manufactured a defectively designed machine. Believing that this factual finding foreclosed any liability, the district court thereupon entered judgment for the defendant.

The principal question raised by this appeal is whether the district court erred in permitting the defendant to argue to the jury and to present evidence showing that Harris, the purchaser of Cincinnati's equipment, was in a better position than Cincinnati to eliminate the safety hazard that caused the injury. We are satisfied that, under the circumstances, the district court did not err in admitting this evidence. Finding plaintiff's other grounds for appeal also lack merit, we will affirm the judgment of the district court.

## I.

Understanding of the legal principles we apply in this case requires a brief description of the machinery involved. The coil splitting line manufactured by the defendant comprises three distinct components; each component performs a distinguishable stage of the coil splitting operation. The first component is an uncoiler. It dispenses, much in the way of a toilet tissue dispenser, large rolls of coiled steel sheets that are up to five feet wide and weigh up to 60,000 pounds. Fifteen feet from the uncoiler stands the "cutter," a large device that converts the sheets of five-foot-wide steel into numerous strands of narrower steel much in the way that a pasta machine converts sheets of dough into linguine. On the opposite side of the cutter from the uncoiler stands the recoiler, which separately recoils the now-many narrower strands of sheet steel.

The problem with this operation that manifested itself in this case stems from the apparent tendency in some operations for the steel strands to become entangled while they are on their way from the cutter to the recoiler. There was evidence before the district court showing that this tangling was caused by uneven tension on the different strands of steel, which in turn was caused by variations in the thickness or quality of steel sheeting at various points along its cross-section. Thus, the problem varied from plant to plant, depending on the thickness or quality of steel used.

There was evidence that several methods were available to prevent this tangling problem. Some involve devices that even out the tension on the various strands of steel. Some involve purchase of quality cuts of sheet steel that have even thickness. Others involve stopping the operation when tangling develops. Harris Steel, however, selected none of these options but instead had its employees, including Charles Leeds, insert a cardboard by hand between the moving strands of steel coil as they approached the recoiler. It was while he was inserting this paper spacer that the amputation occurred.

At trial, plaintiffs argued that Cincinnati's machine was defectively designed because it allowed these tensioning problems to develop, and that this design defect proximately caused Charles Leeds' injury. Defendant's principal response, made in opening argument and supplemented by testimony, was that it behaved reasonably in designing the machine as it did. In an effort to demonstrate its reasonableness, defendant argued, for example, that "it is really the purchaser of the machine who has to know what the tensioning problems are and make allowance for it"; that tensioning devices were expensive and unnecessary for purchasers that did not experience tensioning problems; that automatic paper stuffing machines did not exist at the time the machine was sold; and that the dangers of paper stuffing "on the fly" could have been avoided simply by stopping the machine when tangling occurred.

The plaintiffs repeatedly and vociferously objected to defendant's "purchaser measures" argument and evidence. Plaintiffs contended that evidence of purchaser measures was inadmissible under New Jersey law because New Jersey law placed the duty to ensure safe products wholly on the manufacturer. Although the district court

overruled the objections and admitted defendant's "purchaser measures" evidence and argument, it did caution the jury that "a manufacturer such as Cincinnati, Incorporated may not rely on some third-party, such as Harris and Sons Steel Company to remedy the unsafe nature of its design." The district court also charged the jury that a product was not "reasonably fit, suitable and safe for its intended or reasonably foreseeable purposes if a reasonably prudent manufacturer knowing of the likelihood that the machine would cause harm or injury would not have placed it on the market." The district court advised the jury to consider several factors in determining the reasonableness of the design. These listed factors included the availability of substitute products, the ability of the manufacturer to eliminate the unsafe character of the product without impairing its usefulness, the expense involved in eliminating the unsafe character of the product, and custom in the industry.

Having heard these instructions, the jury determined Cincinnati's product was not defective. Judgment was thereupon entered for the defendant, and the plaintiffs appeal.

## II.

■ New Jersey law draws a distinction between manufacturer liability for "manufacturing defects," i.e. discrepancies between the nature and quality of a product "intended" by the manufacturer and the product as produced, and "design defects," discrepancies between the design of a product causing injury and an alternative specification that would have avoided the injury. The manufacturer is, in general terms, strictly liable for manufacturing defects but only liable for design defects if his design is "unreasonable." *See Cepeda v. Cumberland Engineering Co.*, 76 N.J. 152, 386 A.2d 816 (1978); *see also Suter v. San Angelo Foundry*, 81 N.J. 150, 406 A.2d 140 (1979). So much is clear. New Jersey law is not a model of clarity, however, when it comes to defining the factors relevant to determining the "reasonableness" of a manufacturer's design. Specif-

ically, it is not entirely clear when (if ever) New Jersey would admit evidence that a purchaser of the product could have taken steps to enhance the safety of the product as part of a manufacturer's case demonstrating the reasonableness of his design.

■ The battle in this case lies in the parties' efforts to reconcile three New Jersey Supreme Court cases dealing with design defects, and, to some extent, with the "purchaser measures" defense. *Bexiga v. Havir Manufacturing Corp.*, 60 N.J. 402, 290 A.2d 281 (1972); *Cepeda v. Cumberland Engineering Co.*, 76 N.J. 152, 386 A.2d 816 (1978); and *Suter v. San Angelo Foundry*, 81 N.J. 150, 406 A.2d 140 (1979).

*Bexiga* was a case much like this one where a plaintiff lost his fingers as a result of an alleged design defect in manufacturing equipment purchased by his employer. The precise issue before the New Jersey Supreme Court was whether the trial court had acted correctly in dismissing plaintiff's case at the close of plaintiff's evidence because unchallenged evidence had been adduced showing that it was the custom in the trade for purchasers to install safety devices and because installation of safety devices by the manufacturer was impracticable because the equipment could be put to a variety of uses. The New Jersey Supreme Court reversed the trial court's dismissal of the case:

Where a manufacturer places into the channels of trade a finished product which can be put to use and which should be provided with safety devices because without such it creates an unreasonable risk of harm, and where such safety devices can feasibly be installed by the manufacturer, the fact that he expects that someone else will install such devices should not immunize him. The public interest in assuring that safety devices are installed demands more from the manufacturer than to permit him to leave such a critical phase of his manufacturing process to the haphazard conduct of the ultimate purchaser. The only way to be certain that such devices will be installed on all machines—which the

public interest requires—is to place the duty on the manufacturer where it is feasible for him to do so.

We hold that where there is an unreasonable risk of harm to the user of a machine which has no protective safety device, as here, the jury may infer that the machine was defective in design unless it finds that the incorporation by the manufacturer of a safety device would render the machine unusable for its intended purposes. As we have said, the jury could infer from plaintiff's evidence that it was feasible for Havir [the defendant] to install the push-button device. Therefore it was error for the trial court to dismiss the strict liability claim at the close of plaintiff's case.

60 N.J. at 410–11, 290 A.2d at 285.

In *Cepeda*, the New Jersey Supreme Court held that the test of liability in design defect cases was "substantially coordinate with liability on negligence principles." [1] To implement this negligence-type standard, the *Cepeda* court explicitly approved of charges to the jury calling their attention to factors such as "the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility" and "the user's ability to avoid danger by exercise of care in the use of the product."

In the *Suter* case, the New Jersey Supreme Court refined the "negligence standard" that *Cepeda* had declared applicable to design defect cases.

Did the manufacturer act as a reasonably prudent person by designing the item as he did and by placing it on the market in that condition, or should he have designed it to incorporate certain safety features or some other modifications? Depending upon the proofs, some factors which may be considered by the jury in deciding the reasonableness of the manufacturer's conduct include the technological feasibility of manufacturing a product whose design would have prevented or avoided the accident, given the known state of the art; and the likelihood that the product will cause injury and the probable seriousness of the injury.

*Suter*, 81 N.J. at 171–72, 406 A.2d at 150–51.

The central question before us, then, is how to reconcile the rhetoric of *Bexiga* which suggests that looking at purchaser measures is improper, with the apparent directive of *Cepeda* and *Suter* to undertake a plenary "reasonableness" inquiry. We believe the defendant and the district court satisfactorily reconciled the cases by interpreting *Bexiga* with specific focus on the procedural posture of the case as it came before the New Jersey Supreme Court, that is, by focusing on the fact that the case came before the Supreme Court on appeal from a dismissal at the close of plaintiff's evidence. Although there is broad language in *Bexiga* about placing the duty for insuring safety on the manufacturer, ultimately, the New Jersey Supreme Court in the *Bexiga* opinion held that evidence that it was the custom in the industry for purchasers to install safety devices and that installation of safety devices by the manufacturer was impractical because the equipment could be put to a variety of uses was evidence for the jury to consider and not dispositive of the question whether the manufacturer had behaved reasonably in designing the machine. Without this focus on the procedural posture of the case and the proper roles of the court and the jury, it is difficult to understand *Cepeda* and *Suter*, both of which professed fidelity to *Bexiga* even as they allowed a seemingly plenary reasonableness inquiry.

---

**1.** The *Cepeda* court noted, however, one significant difference between actions brought under a theory of negligence and actions brought under strict products liability for a design defect. Under the latter, the manufacturer is irrebutably presumed to have knowledge of the dangers of the product. *Cepeda,* 76 N.J. at 172, 386 A.2d at 825. The issue in design defect cases is whether, knowing of the dangers associated with a given product configuration, it was nonetheless "reasonable" to design the product that way. *See infra* parts III & IV.

Ultimately, then, plaintiffs' claim of error rests on the assertion, noted in their brief and stressed at oral argument, that the availability of post-sale measures to the purchaser is not relevant under New Jersey law. In view of the foregoing discussion, we disagree. If, as here, there was evidence before the trial court suggesting that the "tensioning" problem that precipitated hand-stuffing of cardboard into the moving steel coil arose only or primarily where the purchaser of the machine used certain types of lesser-quality steel, and if, as here, there was evidence that installation of tensioning or safety devices by the manufacturer on all coil slitting lines would have been difficult and expensive, we believe the jury could also hear evidence showing that an employer experiencing particular tensioning problems could purchase tensioning or safety devices to handle his special problem. We see no reason why this latter factor, given the conditions cited above, would not be relevant to the plenary reasonableness inquiry seemingly demanded by *Cepeda* and *Suter*. While we cannot be blind to the possibility that introduction of this evidence was prejudicial in that it confused the jury into believing that the law generally imposed a duty upon the purchaser of products to ensure their safety, we cannot say the district court abused its discretion in balancing this possibility of prejudice against the probative value of the testimony, Fed.R.Evid. 403, especially since the district court charged the jury that the defendant could not rely on third parties to remedy the unsafe nature of its design.

## III.

■ The other grounds for reversal cited by plaintiffs are considerably less problematic. The first concerns the district court's refusal to permit a particular line of questioning during cross-examination of a defense witness. The circumstances surrounding this refusal are as follows. In response to requests for admissions submitted by the plaintiffs, the defendant had denied any knowledge that purchasers of its machines were curing tensioning problems by directing their employees to hand-stuff paper into the moving steel strands. This response was not introduced into evidence. At trial, however, one of defendant's witnesses admitted that in fact defendant did know of the practice. On cross-examination, plaintiffs attempted to attack the credibility of the defendant by asking questions such as "Can you think of any reason why anyone from Cincinnati would deny that under oath." The district court refused to allow this line of questioning on grounds that the witness' personal credibility was not at issue and on grounds that the desired questions prejudiced Cincinnati by portraying it as a "scheming, dishonest and guilty party." The district court did impose sanctions, however, of $287.50 against Cincinnati, the estimated cost of proving the matter submitted in the request for admissions.

We cannot say that the district court abused its discretion in limiting cross-examination. Since the witness had played no role in preparation of the incorrect responses to the requests for admission, the proposed cross-examination did not implicate his credibility and was not otherwise within the proper scope of cross-examination. Nor can we say, given the irrelevance under New Jersey law of defendant's knowledge, *see supra* note 1, that the district court abused its discretion in refusing to permit inquiry into the additional matter of Cincinnati's corporate credibility.

## IV.

■ The plaintiffs also argue that the district court erred when it refused to admit expert testimony showing that a 1960 patent document should have given defendant notice of the problems associated with hand-stuffing of cardboard paper into defendant's equipment. This argument has no merit. New Jersey law irrebuttably presumes in design defect cases that the manufacturer has knowledge of the dangerous propensities of his product. *See supra* note 1. The district court informed the jury of this fact. Thus, plaintiffs' proffered testimony was at worst irrelevant and at most cumulative in that it wasted

time. Fed.R.Evid. 403. The district court did not abuse its discretion in refusing to admit it.

Having found no reversible error committed by the district court, its judgment will be affirmed.